Good morning, Your Honors. My name is Edgardo Quintanilla. I'm the attorney for Mr. Vasquez. This case is about a motion to suppress evidence in the context of a removal hearing in the Immigration Court. In Trias-Hernandez in 1975, this court said that Miranda Tithe warnings were not applicable in the context of immigration law because proceedings in the Immigration Court are civil in nature. The nature of immigration law has significantly changed since 1975 to the extent that immigration law is a hybrid of criminal statutes that have criminal consequences and civil consequences as well. My client, Mr. Vasquez, in December 2001, he had a MR. BASQUEZ-TRUJILLO Counsel, we do have criminal charges that result from the violation of the immigration laws. When people enter the United States without permission from the Attorney General, they may be charged criminally. And Miranda certainly would apply in that context. But this is purely an administrative matter within the purview of the BIA, isn't it? That is correct. But you contend that that has changed since 1975? Since 1975, the nature of the enforcement of immigration law has significantly changed. And can we overrule that prior decision? No, not necessarily, Your Honor. But you can carve an exception. And the exception you will carve will follow along this line, that in December 2001, to separate law enforcement agencies, the FBI and the Immigration Service, jointly began to interrogate Mr. Vasquez. It is because Trias Hernandez in 1975, it's a case which deals with an investigation by INS, which is now the role of INS is now dividing two separate, two or three another one, which deals with civil nature of granting visas, CIS, and the enforcement of immigration laws, which is called ICE, I-C-E. And so the nature, and all of them are under this mega-bureaucracy called the Department of Homeland Security, which is overseeing, supposedly, the enforcement of the immigration laws of the United States. That has significantly changed from 1975. So, you carve this exception, this is our contention, when you have a joint investigation of the FBI, which in nature is to investigate criminal activity, but they can also bring about charges, they can bring about criminal charges. And at the same time, they And that is happening. And then when my client is at his house, two separate agencies, law enforcement agencies, are coming to his home, at that point, what my client is going to say, what a person is going to say, is not going to be involuntary. And so, based on that separate entities, which may be working at the different Mr. Quintanilla, the FBI talks to a lot of people, and they talk to people who subsequently are going to be charged, but it's just in the course of an investigation. They don't have to give a Miranda warning every time they approach somebody's house and go and talk to them. That is correct. And your client here was not, was never charged with any crime. He saw, let's say, a mistake, was filming the downtown of Santa Ana, California. What is different from, let's say, the law enforcement of the FBI on itself with this case is that the FBI brought along the Immigration Service. Subsequently, immigration detained my client. And subsequently, a warrant for the arrest of my client was issued. They didn't know he was in the country legally until they made inquiry. When they made inquiry, discovered that he was in the country legally, are you suggesting they should not have made a referral? Our contention is that when the FBI and the Immigration Service, when you have two separate, distinct No, but the FBI finished with him before they turned him over to immigration, didn't they? They did in the first instance. But there's another second instance that the FBI and the Immigration Service, my client testified that he was interrogated by both of these agencies at the same time. And that's the, our contention, that that's where you can cut a ballot and exception. Because at that point, my client, it is at that point that criminal charges or civil charges can be brought against the person. When you started your analysis from the point of view that removal proceedings are civil in nature, it's a very different type of analysis when you started from the point of view or two separate law enforcement agencies, FBI and Immigration Service, coming together to the home of a person to find out who this person is or for whatever other purpose. And the statements being made or being said at that time are going to be involuntary because there has to be a restraint. There has to be a restraint for the person who all of a sudden, at his house, has to start dealing with individuals who may or may not be armed, but who are at his home asking questions. And we believe at that point, because the nature of immigration law is a hybrid one. It can be criminal. It can also be civil. At this point in time in our country's history, we believe that Miranda-type, Miranda-type warnings should be given to the person. The second argument that we have raised, Your Honors, has to do with a due process issue to which my client was entitled. It is very significant that during proceedings, the immigration judge who heard this proceeding is civil in nature. I would concede that. He said the following one. The immigration judge said, the court presumes that immigration officials and other officials in the United States act in accordance with the statute and regulations of the laws purported to them. And this is found at the record of pages 72, 73. There is nothing in the law of this country that entitles an administrative judge to give this presumption and believe that this is a significant due process violation. Well, counsel, isn't all he's doing there is simply imposing on you the burden of coming forward and saying these guys are violating my constitutional rights or they're violating the agency's regulations or they're violating a statute? Yes, Your Honor. And that's not an unreasonable burden, is it, to put the burden on you to come forward and say there's a problem here? Right. But the issue is not whether there is a reasonable, whether there is a reasonable burden or not. The issue here is what is the constitutional rights that a person can assert. And if the person is entitled to a due process, in the context of the removal hearing, my client was entitled to remain silent. He did assert his Fifth Amendment rights. However, the judge said the court will presume that immigration officials acted pursuing the law. And so that presumption is simply, it is something that the immigration judge is taking when there is nothing in the law that provides him. The prejudice, Your Honors, is that my client has no other relief from removal at this point. If you don't have any other questions, I will reserve the rest of my time. Okay. Thank you, Your Honors. Thank you. Good afternoon, Your Honors. Nicole Nardone, attorney for the Respondent of the United States. I'd just like to begin by clearing up a couple of things that the petitioner's counsel discussed. The investigation by the FBI started with the fact that the FBI had witnessed Mr. Trujillo filming a federal building. And the FBI agent went to, did indeed go to the petitioner's home, but spoke with him in a public place outside of his home. And the petitioner stated on the record that he indeed voluntarily participated in this conversation. He said, I have no reason not to talk with the FBI agent. I mean, essentially he wanted to make sure that he was clearing himself, and he also volunteered information in response to the FBI's questioning about his identity, offered information regarding his immigration status. The petitioner said to the FBI agent, I have a document that shows, essentially he believed that he had a document that showed that he was legal. It did show indeed that he was applying for adjustment of status, but it didn't indeed prove that he was a legal citizen. So he said to the FBI agent, I have the document, I don't have it with me right now. Come back and I will show it to you. The FBI agent then did return with an INS agent. And the petitioner states in his testimony that he never spoke with the INS agent during this visit. The INS agent didn't ask him any questions. All that happened was the FBI officer handed this document to the INS official to show him indeed what he was applying for and what his status was. So there wasn't any interrogation that happened at that point. And indeed, the petitioner volunteered this information because he was trying to prove his status in the United States. So I guess the argument would be, well, the petitioner was entitled to a Miranda warning, but he was not in custody and was voluntarily talking, and so he wasn't entitled to a Miranda warning. Is that the point? Our point is that he did volunteer this information, first of all, and that he wasn't in the situation where he was being interrogated, as Petitioner's counsel suggested, by the INS and the FBI at the same time. And I guess at the very most, it might have been, you might call it a Terry stop, if he felt he couldn't leave or something. Right. But then the questioning would be appropriate. At the most, it would be that. And that would be appropriate in that context. In this context, we would say that the INS had reasonable, articulable suspicion to do so. And with regard to Miranda, I mean, the Miranda rights simply don't apply in these removal proceedings. With regard to his right to remain silent, that applies only to information that would incriminate him on criminal grounds. And certainly just his status as a citizen is not considered to be a criminal admission in any way. Okay. And when you went to the when you went to the home or the place where this fellow was living, did the FBI accompany the INS agents on that investigation, if you will? There were a number of visits by the FBI. The one where they knocked or they told him to get up. He was in the final. I believe this was the final visit by the INS. That was only the INS was doing that. Only the INS alone went. And what the facts reveal is that the petitioner lives in a home where his room is essentially in the back of this house. And the INS officials went around to his door of his room where he was living and knocked on the door. And the petitioner opened the door and they asked him if he could produce documentation of his legal status in the United States. And he said he didn't have any documentation with him. And essentially at that point they arrested him. And then at the hearing, the IJ tells him to answer the question as to where he was born. With regard to the hearing, the only time that the petitioner asserted his Fifth Amendment right not to incriminate himself was with regard to this one particular statement, which was a question, which was whether he was born. And the IJ did, over that statement, require him to respond. However, this would not, again, this would not be a fact. The fact that he was born in Mexico would not be a fact that would incriminate him. A fact that he would in some way be covered by a Fifth Amendment right. Based on the foregoing, it's our position that the petitioner has not set forth any constitutional violations in either his investigation by the INS or his arrest or subsequent removal of hearings. If the Court doesn't have any questions, that's all I have. Thank you, Ms. Nardone. Mr. Quintanilla. Thank you, Your Honors. Your Honors, the government has conceded that there was a joint investigation of the FBI and the Immigration Service. It is because of this joint investigation, at which time there was a possible filing of criminal and or civil charges against my client, that we believe that the exception we're asking you in the trial, Hernandez, to the requirement requiring Miranda-type warnings to be given when there is a joint FBI and the Immigration Service. What did they ask him? The questions, I do not have the record with me, Your Honor. What did he answer? The answer, he was asked where he was born. And he answered he was from Mexico. And it's your position that he should have been Miranda-ized before he answered that question? Within the context of a joint investigation of the FBI and the Immigration Service. Miranda-ized. For incustodial interrogation. Was he in his home or was he in custody? I believe that this particular conversation took place at his home. Did that make a difference? It may or may not make a difference, Your Honor. Should it make a difference? It should make a difference. Because if he's at his home, it is his castle. And it's the full, I mean, he cannot, no law enforcement agency can simply knock at the door and enter a person's home and start asking questions about where are you born? Where are you from? Your Honor, the government has not disputed or contested the fact of the immigration judge's view about this presumption that law enforcement cannot do any wrong. And we believe that even if this Court were to find that no other type of warnings or exceptions can be created. As I understand it, your basic argument, though, is that he should have been Miranda-ized. You've told me his answer to the question. You don't recall the question. And you've told me the setting in which he was asked. Yes, Your Honor. I agree with you. Thank you, Your Honor. Thank you very much. I appreciate the arguments of counsel. The last case will be submitted. We'll proceed to the last case of the day, United States v. Tapia. Thank you.
judges: Thompson, Tashima, Bybee